## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| **In re Patricia A. Primes,**<br><br>**Debtor.** | **Bankruptcy No. 13-B-83310**<br>**Chapter 13**<br>**Judge Thomas M. Lynch** |

## MEMORANDUM DECISION

Before the court is Alpine Bank & Trust Co.'s motion to modify the automatic stay. Alpine Bank seeks relief under 11 U.S.C. § 362(d)(2) for certain real estate located in Rockford, Illinois, arguing that the Debtor is not entitled to possession by virtue of a Quit Claim deed given to the bank in connection with a forbearance agreement. Alpine Bank contends that the plan's proposed treatment of the property as remaining vested in the Debtor in her proposed Chapter 13 plan is invalid and, therefore, the property is not necessary for her effective reorganization. For the reasons discussed herein, the motion is denied.

## JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter adjudicates a motion for relief from the automatic stay and is a core proceeding arising under title 11 in which the bankruptcy court is authorized to enter final orders. 28 U.S.C. § 157(b)(2)(G). *In re Woods*, 13BK39194, 2014 Bankr. LEXIS 3507 (Bankr. N.D. Ill., August 18, 2014).

## FACTS AND PROCEDURAL BACKGROUND

The parties do not dispute most of the relevant facts. From the review and consideration of the procedural background and the docket of this case, the Debtor's previous Chapter 13 case ( No. 10BK72718 (Bankr. N.D. Ill. 2010) the "2010 Case"), and from all the exhibits submitted and the testimony and exhibits.[1] presented at the evidentiary hearing on the motion, the court finds as follows

For many years Patricia Primes has lived at 4020 Mila Avenue in Rockford, Illinois. On or about November 30, 2004, Ms. Primes granted a mortgage in the property to Alpine Bank of Illinois to secure her promissory note for the principal amount of $73,050. The note provided for monthly payments of $461.73 with a balloon payment of the remaining balance on December 1, 2007. The mortgage was recorded on December 2, 2004. The Debtor apparently failed to repay the loan after it matured and Alpine, now known as Alpine Bank and Trust Co.,[2] filed a foreclosure action in Winnebago County in 2010 to foreclose on the property. Alpine Bank brings this motion under Section 362(d) of the Bankruptcy Code to allow it to proceed with its foreclosure action against the Mila

---

[1] The exhibits offered by the bank in support of its motion at trial are: the Debtor's Balloon Note and accompanying Mortgage dated November 30, 20, 2004 and her Quit Claim Deed dated July 13, 2011, the July 2011 Forbearance Agreement, together with the Debtor's Chapter 13 Plan dated September 25, 2013, filed in this case as well as her Chapter 13 Plan dated February 10, 2011 that was filed in her 2010 bankruptcy case. The Debtor offered no exhibits at trial.

It is well-settled that the court may take judicial notice of its own docket. *See Levine v. Egidi*, No. 93C188, 1993 WL 69146 at *2 (N.D. Ill. March 8, 1993); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989). To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

[2] The parties do not dispute that Alpine Bank and Trust Co. has standing to bring this motion. The Federal Deposit Insurance Corporation reports that the name of insured entity formerly known as Alpine Bank of Illinois was changed to Alpine Bank & Trust Co. in July 2008. *See* FDIC "Bankfind" (search for Alpine Bank, Rockford, Illinois) http: //research.fdic.gov/bankfind/detail.html?bank=18545&name=AlpineBank (accessed 9/10/2014).

Avenue property.

*The First Chapter 13 Case.* After Alpine commenced its foreclosure action in the state court the Debtor commenced her first voluntary Chapter 13 case on May 27, 2010. Alpine filed its proof of claim to assert a secured principal claim of $79,535.42, in support of which it attached Primes' 2004 note and mortgage. No one objected to Alpine's proof of claim. Subsequently the court confirmed the Debtor's proposed Chapter 13 plan. (2010 Case, ECF No. 40). That plan provided, in pertinent part, for the Debtor to make direct payments of $902.00 per month to Alpine as "current monthly payments." The plan further provided:

> No payments shall be made by the Trustee on the claim of Alpine Bank
> for pre-petition mortgage arrears on the Debtor's homestead property
> located at 4020 Mila Avenue, Rockford, Illinois. Alpine Bank shall have
> immediate relief from the automatic stay and has agreed to rewrite the
> Debtor's mortgage loan to include all past due principal, interest and costs.

(Chapter 13 Plan, Section G, 2010 Case ECF No. 38). The Debtor completed her plan payments and a discharge order was entered on April 1, 2013. (ECF No. 60). The 2013 case subsequently closed and the Chapter 13 Trustee was discharged on May 24, 2013, following the submission of the Trustee's Final Report. (ECF Nos. 62, 63).

*The Forbearance Agreement.* As anticipated by Section G of the Plan, the Debtor and Alpine entered into an agreement styled "Forbearance Agreement" on July 13, 2011. The Forbearance Agreement recited that Alpine and the Debtor had agreed "to modify the terms of the [2004] Note" whereby: (i) the "Promissory Note is hereby changed as of July 5, 2011 to $83,408.86," (ii) the "maturity date is changed to 2016," (iii) "Monthly Payment of Principal and Interest = $500.08," (iv) "Monthly Real Estate Tax and Insurance Escrow = $440.27" and (v) "Total Monthly Payment = $940.35." Paragraph 7

of the Forbearance Agreement further states:

> As part of this Forbearance Agreement, Borrower has agreed to execute a Quit Claim Deed from Borrower to Bank for the Property. A copy of said Deed is attached hereto and marked as <u>Exhibit C</u>. Said Deed shall be held in escrow with _____. [sic] <u>Said Deed shall remain in escrow and not be recorded or delivered to Bank until the earlier of the following events</u>:
>
> > (a) If a default occurs under the terms of this Agreement (or any documents associated therewith), Bank shall give written notice to Borrower of said default and give Borrower thirty (30) days to cure said default. If said default is not cured within thirty (30) days, _____ [sic] is directed to release the Deed to the Bank and the Bank is entitled to record said Deed and take possession of the Property. <u>By the recording of said Deed, Bank is not releasing Borrower from any indebtedness due Bank</u>. Upon the sale of the Property, Bank shall provide a credit to Borrower against the indebtedness which is due at that time. Any deficiency which remains after the sale of the Property shall be due and payable in full to Bank from Borrower. Nothing in this Forbearance Agreement or in any other document shall prohibit Bank from instituting collection proceedings immediately against Borrowers in the event that a default is not cured within the cure period stated herein.
> >
> > (b) If Bank is not paid in full by August 1, 2016, _____ [sic] is directed to release the Deed to the Bank and the Bank shall be allowed to record the same. <u>The recording of the Deed will not extinguish the debt of Borrower to Bank</u>.

(Mot., Ex. A, ECF No. 21. (emphasis supplied)).   The Forbearance Agreement also recites that it "shall be construed in accordance with the laws of the State of Illinois" and that the "Borrower and Bank each acknowledge that they have thoroughly read and reviewed [its] terms and provisions . . . and . . . entered into [it] freely, voluntarily, with full knowledge and after consulting with their attorneys." *Id.*, ¶¶ 11, 14.

On July 13, 2011, the Debtor signed the quit claim deed that purports to convey the Mila Ave. property to Alpine.  The instrument states: "this deed is a deed in lieu of foreclosure under 735 ILCS 5/15-1401 and all rights associated and granted by this deed

to Grantee shall remain as stated by Illinois law." (Mot., Ex. C, ECF No. 21.)
Thereafter, Alpine voluntarily dismissed its foreclosure action.

When the Debtor failed to make her May and June, 2013 installment payments
under the Forbearance Agreement, Alpine notified her that it would record the quit claim
deed if she failed to timely cure her default. The Debtor failed to do so and Alpine
recorded the quit claim deed on August 9, 2013.

*The Second Chapter 13 Case.* The Debtor filed this bankruptcy case, also under
Chapter 13, on September 25, 2013. On the same day she filed a 36-month plan which
proposed "current monthly payments" in the amount of $940.35 to be paid directly to
Alpine. It further provided for the repayment of the bank's $4,750 "mortgage arrearage"
claim through additional plan payments to the Chapter 13 trustee. (2013 Chapter 13
Proposed Plan, ECF No. 9). This proposed Chapter 13 plan also provided that:

> Notwithstanding the Quit Claim Deed signed by the Debtor in favor of
> Alpine Bank and Trust Company pursuant to the Forbearance Agreement
> between the parties ownership of the Debtor's real estate located at 4020
> Mila Avenue, Rockford, Illinois shall remain vested in the Debtor, subject
> to the Mortgage held by Alpine Bank and Trust Company, which secures
> payment of the Promissory Note held by Alpine Bank and Trust Company.
> (*Id.*)

The Debtor's proposed plan at the time of the hearing on Alpine's motion,
therefore, appears to reinstate the note with Alpine as modified by the Forbearance
Agreement and repay the Debtor's arrearage according to its terms through the Chapter
13 plan.[3] Subsequent to filing her current Chapter 13 case, or at least by the filing of the

---

[3] The plan is somewhat ambiguous and does not expressly explain what is to be done about the August 1,
2016 balloon payment under those terms, which is within the 36-month term of the plan. Although there
was some ambiguity in the language of the Forbearance Agreement itself – which listed only a year and
not a month or day for the balloon payment and maturity date – the uncontroverted testimony at trial

bank's motion, Ms. Primes returned to her job and resumed making her direct monthly payments to the bank, payments that Alpine accepted.

Ms. Primes testified at trial that she did not understand any of this and that she did not know what a quit claim deed means or what forbearance is, claiming that her attorney did not explain these terms to her. She does not dispute that she was represented by counsel when she signed those documents. The Debtor testified that she signed the Forbearance Agreement and thereafter paid the required monthly installments to Alpine until she fell behind when she broke her wrist and was unable to work for several months. She further testified that after she returned to work, the bank accepted her resumed payments and continues to do so. Alpine apparently does not dispute that it issued receipts for the Debtor's "loan payments" when she resumed her payments in the fall of 2013.

An officer of the bank testified at trial that the purpose of the quit claim deed was to help the bank collect its debt and that Alpine continued to carry the Debtor's loan on the books after it received the quit claim deed in July, 2011. He admitted during cross examination that it was not the bank's "understanding" that it was receiving the Rockford property at that time, but rather that the deed was "just security for the loan." The bank officer further testified that the bank took physical possession of the quit claim deed at or around July 13, 2011, the date of the Forbearance Agreement, and that the bank did not immediately record the instrument, but rather held it until August 2013.

When questioned about the Debtor's resumption of payments in 2013, the bank's witness did not dispute Alpine received the payments. While he "personally did not think

_____

indicated that the parties intended that the new maturity be on the 5-year anniversary of the Agreement, July 13, 2016.

these were loan repayments," Alpine's witness could not say how in fact the bank treated the payments on its books.

The bank offered no testimony with respect to the value of the property. The Debtor's Schedule A lists its value as $85,000 and the value of the bank's secured claim as $83,000. The required statement accompanying the bank's motion also lists the "estimated value of collateral" to be $85,000 and did not state the bank's loan balance. The bank's officer testified that the principal due as of the date of the Forbearance Agreement was $83,408.86. He further testified that he was not aware of the current balance but believed it to be "around $80,000." With regard to the maturity of the Forbearance Agreement in July 2016, the Debtor testified that she can "refinance" when the balloon payment comes due, further explaining that family members can help her with the financing if necessary.

The Debtor filed an amended Chapter 13 plan after the evidentiary hearing. (ECF No. 68). It extends the duration of the plan from 36 to 48 months to address a secured automobile loan. The pertinent change with respect to Alpine is the following addition to Paragraph G: "[i]n additional [sic] to the other payments provided for in this Chapter 13 Plan, the remaining unpaid balance owed to Alpine Bank & Trust Company shall be paid in full by the Debtor on or before August 1, 2016." *Id.*

## DISCUSSION

Section 362(d) provides, in pertinent part, that after notice and a hearing a bankruptcy court shall grant relief from the automatic stay against property if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. 362(d)(2). Alpine argues that the pre-petition

recording of the quit claim deed transferred ownership in the Mila Ave. property to the bank. Alpine thus contends that as of the petition date the Debtor had no interest in her residence and no right to redeem the property, and, therefore, the property is not necessary for her reorganization. *See, e.g., Colon v. Option One Mortgage Corp.*, 319 F.3d 912 (7th Cir. 2003) (automatic stay may be lifted because at the time debtor filed her plan under Chapter 13 she "had no right to redeem"). Ms. Primes argues in response that under Illinois law the quit claim deed given in connection with the Forbearance Agreement must be treated as an equitable mortgage, that the bank's recording of the deed without judicial foreclosure is ineffective to transfer her ownership interest, and that she is entitled to cure her default and satisfy the bank's secured claim through her Chapter 13 plan. Under the facts presented, the court finds the Debtor's argument to be correct under Illinois law.

### A. Contingent Transfers of Property Interests and the Equitable Right of Redemption Under Illinois Law.

#### 1. Illinois Disfavors Attempts to Extinguish the Equitable Right of Redemption or Otherwise Evade Judicial Foreclosure.

Illinois law generally requires judicial foreclosure to involuntarily terminate a mortgagor's interest in real property. 735 ILCS 5/15-1106. "The only method by which a mortgagee can enforce a mortgage to collect the mortgage debt, other than with the consent of the mortgagor, is by a filing a complaint to foreclose the mortgage and sell the mortgaged property." 10 Illinois Real Property Service §54:2 (John Francis Major & Steven J. Cone eds., 2014). Thus, for example, a lender must bring a mortgage foreclosure action and may not proceed with an action for forcible entry and detainer to enforce its rights under a purported deed given by the mortgagor if the court determines

the deed to be an equitable mortgage. *First Ill. Nat'l Bank v. Hans*, 493 N.E.2d 1171, 1174 (Ill. App. Ct. 1986). While a mortgagor can voluntarily transfer or relinquish his or her interest in the real property, Illinois statutes and established case law generally require the purported transfer to be found void or recharacterized, particularly where the transfer is to a lender and contingent on a future default.

First, Illinois law expressly prohibits and renders void agreements "contained in" or made "in connection with" a mortgage that are intended to circumvent judicial foreclosure. The Illinois Mortgage Foreclosure Law states that "[n]o real estate within this State may be sold by virtue of any power of sale contained in a mortgage or any other agreement, and all such mortgages may only be foreclosed in accordance with this Article." 735 ILCS 5/15-1405. As the Illinois Supreme Court has explained, the purpose of the statutory predecessor to the current section 1405 was "to prevent sales of the equity of redemption, and no scheme or device to evade the statute or circumvent it by providing for a sale depriving the debtor of his equity of redemption will be upheld." *De Voigne v. Chicago Title & Trust Co.,* 136 N.E. 498, 501 (Ill. 1922). As discussed below, a review of the act as amended and the cases construing it reveals this to continue to be the rule.

Illinois courts generally "take a dim view of any attempt to limit or extinguish the mortgagor's equitable right of redemption." *Hans*, 493 N.E.2d at 1174. In addition to the statutory restriction on powers of sale, Illinois law also invalidates an agreement made in advance to provide or convey a quit claim deed upon future default or to waive the equitable right of redemption where it is "part of" or "in connection with" an original mortgage. *See, e.g., Hans, id.* at 1174 (finding a purported assignment of rights under installment contract made in connection with and as security for a loan to be an equitable

mortgage and an assignment provision purporting to require mortgagor to execute a quit claim deed in lieu of foreclosure to be "null and void"). From its review of Illinois decisions the Illinois Supreme Court has concluded that the cases have "consistently held that the law favors redemptions." *Household Bank, FSB v. Lewis*, 890 N.E.2d 934, 939 (Ill. 2008) (collecting cases).

Further, Illinois law treats a purported transfer of deed as a mortgage if it is intended as security to secure a loan. Section 1207 of the Illinois Mortgage Foreclosure Law defines "mortgage" to include "without limitation … every deed conveying real estate, although an absolute conveyance in its terms, which shall have been intended only as a security in the nature of a mortgage"). 735 ILCS 5/15-1207(c). *See also* 735 ILCS 5/15-1207(d), (e) (term "mortgage" also includes "equitable mortgages" and "instruments which would have been deemed instruments in the nature of a mortgage prior to the effective date of this amendatory Act of 1987"). As noted in *Hans*, "[e]xpress words are not necessary to create an equitable mortgage; the only requirement is that it clearly appear from the document that the parties intended that an identifiable parcel of property 'be held, given or transferred as security' for the payment of a debt." 493 N.E.2d at 1174 (quoting *Hibernian Banking Ass'n v. Davis*, 129 N.E. 540 (Ill. 1920)).

Where it is demonstrated that the consideration for the deed is a prior indebtedness and it is demonstrated that the indebtedness was not satisfied by the purported conveyance "it will be presumed that a mortgage was intended." *Wiemer v. Havana Nat'l Bank*, 335 N.E.2d 506, 511 (Ill. App. Ct. 1975) (citing *Wallace v. Greenman*, 152 N.E. 137 (1926)). The party asserting that a transfer occurred bears "the burden of proving otherwise." *Id.* This is because a purported transferee "cannot hold the

land absolutely, and at the same time retain the right to enforce payment of the debt, on account of which it was made." *Id.* at 586 (quoting *Sutphen v. Cushman*, 35 Ill. 186 (Ill. 1864)).

2.    **The Doctrine of Equitable Mortgage and Related Principles Apply to Forbearance Agreements.**

The doctrine of equitable mortgage applies not only to purported transfers executed at the time money is lent, but also to deeds executed after the time the debt is created such as in the context of an amendment, a refinancing, a forbearance agreement or other work-out situation. "If there is an indebtedness or a liability between the parties, *either a debt existing prior to the conveyance or from any other cause*, and this debt is still left subsisting ... then the whole transaction amounts to a mortgage." *Warner v. Gosnell*, 132 N.E.2d 526, 529 (Ill. 1956) (emphasis added). *See also Wynkoop v. Cowing*, 21 Ill. 570 (Ill. 1859) ("[T]he unrestricted right of redemption will be extended to transactions between the parties, in the nature of security for the debt, subsequent to the original mortgage."). In such cases, the most important factor used in determining whether a purported deed was intended as a mortgage is whether there remains a debt for which the deed serves as security. The Illinois Supreme Court identifies the essential criterion to be

the continued existence of a debt or liability between the parties, so that the conveyance is in reality intended as a security for the debt, or indemnity against the liability. If that liability is left as subsisting, and if the grantor is regarded as still owing, and bound to pay it at some future time, ... then the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instruments.

*Schwartzentruber v. Stephens*, 133 N.E.2d 33, 36 (Ill. 1956) (quotation marks omitted).

(quoting *Warner*, 132 N.E.2d at 529).  *See also Illinois Trust Co. of Paris v. Bibo*, 159

N.E. 254, 257 (Ill. 1927)).

The continuing debt factor "furnishes a sufficient test in the great majority of

cases" and it is only "when application of this test leaves a doubt [that it is] necessary to

consider other circumstances surrounding the transaction." *Wiemer*, 335 N.E.2d at 511

(reversing trial court for its reliance on testimony about statements made at the time of

the transaction, and finding that plaintiff had failed to overcome presumption that

purported deed was a mortgage).  These include "every fact or circumstance tending to

illustrate the purpose and intent of the parties," such as:  (i) the fact of an existing

indebtedness in respect to which the deed was executed; (ii) the retention of the evidence

of such indebtedness by the grantee in the deed; (iii) that the deed was procured by fraud

or oppression or undue advantage; (iv) that there was a loan of money; and (v) the

subsequent conduct of the parties in respect to the land. *Schwartzentruber*, 133 N.E.2d. at

36. The question of whether a document is a deed or a mortgage "depends upon the

intentions of the parties in that regard *at the time of its execution*" and "its character at the

time of such delivery becomes fixed as of that time." *Id.* at 35 (quoting *Warner*, 132

N.E.2d at 529) (emphasis added).

More than a century ago, the Illinois Supreme Court determined that a conditional

quit claim deed executed in connection with a forbearance agreement is a mortgage.

*Bearss v. Ford*, 108 Ill. 16 (Ill. 1883).  In *Bearss*, a landowner borrowed money, giving

the lender two promissory notes secured by two deeds of trust in a certain parcel of land.

Several years later, the landowner defaulted on required tax and interest payments due

under the notes and his lender threatened to foreclose.  The lender eventually agreed to

accept instead the borrower's quit claim deed conveying the property to the lender subject to the proviso that if the landowner paid the taxes and repaid the amounts owing on the notes and trust deeds within one year with interest, the conveyance would be void and the lender would reconvey the property back to the landowner. In connection with this arrangement the parties also executed a one-year lease whereunder the debtor, to maintain possession of the land, paid to the lender monthly rent which rent was "to be deemed and applied as interest, under the conditions of" the quit claim deed. *Bearss*, 108 Ill. 16.[4]

The court began its analysis with the acknowledgment of the well-established rule in the law of mortgages "which permits the showing of a deed plain and unambiguous in its terms, and absolute on its face, to be a mortgage or mere security for the loan of money." *Id*. The court then held that:

> in construing instruments of this kind, when the consideration is an existing mortgage indebtedness, [courts] are more inclined to treat them as mortgages than when given upon an original advance, and when so treated they will not be regarded as a substitute for the former security, unless the intention to that effect is manifest, and in such cases the original mortgage may be foreclosed notwithstanding the giving of the new one, hence the principle "once a mortgage always a mortgage," has become a leading fundamental doctrine of the law of mortgages. The most satisfactory, and as a general rule the controlling, test in cases of this kind is, does the giving of the new instrument operate as a satisfaction or extinguishment of the mortgage indebtedness? If it does not, such new instrument will be treated as an additional security for the debt, or, in other words, as an additional mortgage....

*Id*. (emphasis added).

Thus under Illinois law a deed in escrow given in connection with a forbearance agreement is not presumed out of hand to be a true transfer. The primary question for

---

[4] While there was a dispute as to whether the quit claim deed had been effectively "delivered" the court found that it did not need to address that issue because even if properly delivered the deed should be treated as a mortgage. 108 Ill. 16.

determining whether to treat the purported conveyance as a true transfer or simply additional security is whether the original indebtedness was satisfied or extinguished. In *Bearss,* the court noted that the agreements did not expressly provide for satisfaction or extinguishment of the existing debt, that the original note and trust deeds were not surrendered and that the lease expressly recognized the continuing debt. It concluded that the "so-called quitclaim deed was a mere additional security, and not an absolute conveyance of the property." *Id.* the court noted that whether the parties intended for title to transfer automatically upon a future default without the need for judicial foreclosure was not dispositive, noting that the "parties may have intended, and doubtless did intend, that if the premises were not redeemed before the 1st of July, 1879, [the instrument should become an absolute deed] in order to avoid the expenses of a foreclosure. But it is evident that parties can not, by mere agreement, change the law of the land." *Id.* Rather, as the court emphasized:

> nothing is more firmly established in the law of mortgages than that it is not competent for the parties, even by express stipulation, to cut off the right of redemption, and to permit them to make such an instrument an absolute deed upon some future contingency, would simply be cutting off the right of redemption, which, as we have just seen, can not be done."
> *Id.*

Illinois courts continue to "adhere[] to the principle ... that a mortgage remains a mortgage until the right of redemption is barred by one of the modes recognized by law and have repeatedly stated that the parties cannot by an express stipulation in the mortgage transform the instrument into an outright conveyance upon default, which would operate to deprive the mortgagor of his redemptive rights." *Hans,* 493 N.E.2d at 1174 (collecting cases). For example, in *Wiemer v. Havana Nat'l Bank,* the court found that a purported deed in connection with a workout agreement was in fact a mortgage.

335 N.E.2d 506 (Ill. App. Ct. 1975). There, a couple executed a trust deed in connection

with a refinancing indebtedness secured by real property.   The trust deed purported to

transfer the real estate into a trust that named one of the debtors' pre-existing lenders as

the trustee.  The trust deed purported to grant the trustee the power to sell the property

and also required the debtors to execute and deliver a quit claim deed.  The trust deed

further provided that "[a]fter all debts to the banks are paid in full, the trustee shall

convey any unsold property to the [debtors]." *Id.* at 508.  When the debtor refused to

execute the quit claim deed and challenged the lender/ trustee's right to attempt to sell the

land, the lender brought an action to compel the debtors to perform and to remove the

cloud on the title.  On appeal, the reviewing court reversed the trial court's determination

that  upheld the trust deed was a conveyance, holding that, because the debt to the lender

continued after the purported transfer and was not satisfied, the deed must be presumed to

be a mortgage. *Id.* at 511.  Further, the appellate court found the power of sale contained

in the trust agreement to be void. *Id.*[5]

---

[5] While The Third Restatement of Property acknowledges the effectiveness of traditional (immediate <u>and</u> unconditional) deeds in lieu of foreclosure, it, too, concludes that a contingent or escrowed deed in lieu of foreclosure will not usually be effective to cut off a mortgagor's right of redemption. Restatement (Third) of Property (Mortgages) §3.1, cmt. f (1997).  In doing so, the Restatement notes the policy concern that a borrower is in need of funds at the time of purchase and may be overoptimistic about "his or her capacity to surmount future difficulties." *Id.* , Reporter's Note to Comment f.  Where a mortgagor is surrendering the property pursuant to an immediate deed in lieu of foreclosure, the mortgagor is not receiving any funds or maintaining possession of the property and does not need to make predictions about his or her own future ability to perform.  However,

> if it is a subsequent agreement for future forfeiture, the "mirage of hope" is sufficiently strong to bring it under the general ban against forfeitures due to "misreliance upon airy hope." In the latter setting "hope springs eternal." Finally, if anything, the mortgagor is in a weaker bargaining position in the work-out setting than at the time of the original loan transaction. In the latter situation, after all, a mortgagor who does not like the terms being proposed by the mortgagee presumably can shop elsewhere for a different lender. On the other hand, in most work-out contexts, the mortgagor clearly cannot choose a different lender and, consequently, is in a weaker position concerning terms being demanded by the mortgagee.

Alpine Bank identifies several decisions of lower courts that have upheld the use of a contingent deed in lieu of foreclosure. However, none of these cases directly address the issue now before this court, let alone question the clear authority of the state's highest court. For example, in *Joyce v. Fidelity Real Estate Growth Fund II, L.P.*, 993 N.E.2d 532, 540 (Ill. App. 2013), the appellate court was not asked to examine the nature or effect of the purported deed under Illinois law, but only whether as a matter of Massachusetts contract law there was a breach of the agreement and if so, whether that breach was sufficiently 'material' to trigger the lender's right to record the deed.

An earlier appellate decision cited by the bank, *Klein v. Devries*, concerned a bankruptcy plan provision providing for the debtor to deliver a quit claim deed to be held in escrow. 722 N.E.2d 784 (Ill. App. Ct. 1999). The court held that once the debtor entered into the reorganization plan, "he had no right to cure a default on the mortgage, [the debtor's] title to the property was altered from fee simple to fee simple defeasible." *Id. at* 787. That case is inapplicable here as it involves the Bankruptcy Code's general pre-emption of state law restrictions on the power to retain, transfer or sell property of the debtor through a plan. See 11 U.S.C. §1123(a)(5). See, e.g., *In re Federal-Mogul Global Inc.*, 684 F.3d 355 (3rd Cir. 2012) (Section 1123(a)(5)(B) preempts anti-assignment clauses in insurance policies). Here, unlike *Klein*, the deed in escrow is not a provision of the Debtor's plan. Although the Chapter 13 plan in Ms. Primes' first bankruptcy contained a vague statement that Alpine "has agreed to rewrite the Debtor's mortgage

---

*Id.* (quoting 1 G. Nelson & D. Whitman, Real Estate Finance Law 43 (3d ed. 1993)). The Restatement also notes that the concept of equitable mortgage and the equitable right of redemption were developed in part to prevent windfalls to creditors who might otherwise receive title to property worth far more than the debt they were owed. *Id.* at §3.1, cmt. a. See also *Union Mut. Life Ins. Co. v. White, 106 Ill. 67* (Ill. 1883) (expressing similar concern).

loan," it did not expressly provide for the quit claim deed and her deed and Forbearance Agreement were signed well after the plan was confirmed and automatic stay lifted. (2010 Case, Chapter 13 Plan at §G, ECF No. 38.) *In re Prairie Crossing, L.L.C.*, like *Klein*, considered issues arising under the Bankruptcy Code and not the effectiveness of a deed under Illinois law. No. 99 Civ. 3558 (N.D. Ill. 2000), 2000 WL 1468755 ("[d]ebtor cites no facts, whatsoever, to support the contention that it retains any interest in the property now that the period for fulfilling the contingency has expired." *Id.* at *5). Neither *Klein* nor *Prairie Crossing* contains any reference to the doctrine of equitable mortgage or to whether a contingent deed in lieu must be recharacterized under Illinois law as a mortgage and, therefore, do not furnish precedent for the issue now before this court. See, e.g., *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissent) ("Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed.") (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 272 (1990).

The *Flores* decision mentioned by Alpine Bank also fails to suggest that Illinois law has changed regarding the Debtor's equitable right of redemption. *Eastern Savings Bank, FSB v. Flores*, 977 N.E.2d 242 (Ill. App. Ct. 2012), overruled on other grounds by *BAC Home Loans Servicing, LP v. Mitchell*, 6 N.E.3d 162 (Ill. Mar. 20, 2014). Whether a party can contractually waive service, the question considered by the appellate court in *Flores*, involves quite different statutes, different doctrines and different policies from those at issue here and cannot support disregarding the principles set down by *Bearss* and its prodigy as Alpine would now have this court do. [6]

---

[6] The decisions from other jurisdictions that uphold provisions in work-out agreements dealing with escrowed deeds cited by Alpine Bank are similarly unpersuasive. See *Ringling Joint Venture II v.*

3.  **Illinois' Statutory Recognition of Deeds in Lieu of Foreclosure Does Not Supplant the Equitable Mortgage Doctrine.**

Alpine argues that 735 ILCS 5/15-1401 modifies doctrine of equitable mortgage for post-default transactions because the Illinois Mortgage Foreclosure Law now recognizes quit claim deeds.  Section 15-1401, entitled "Deed in Lieu of Foreclosure," provides that a "mortgagor and mortgagee may agree on a termination of the mortgagor's interest in the mortgaged real estate after a default by a mortgagor." 735 ILCS 5/15-1401. Alpine argues that a forbearance agreement, providing as is the case here, for the automatic termination of the mortgagor's interest upon the occurrence of a future contingency is the type of "agreement" contemplated by the phrase "agree on a termination" found in the statute.

This argument does not stand up to close inspection.  The term "deed in lieu of foreclosure" as commonly used involves the immediate transfer of the mortgaged property, often in full satisfaction of the debt, by the mortgage in distress. The term involves the procedure whereby a mortgagor/debtor reconveys his equity of redemption in the defaulted property to the mortgagee/creditor in consideration of the creditor's promise to forbear from suing on the debt or foreclosing the security is known as a deed

---

*Huntington Nat'l Bank*, 595 So.2d 180 (Fla. Dist. Ct. App. 1992); *Guam Hakubotan, Inc. v. Furusawa Investment Corp.*, 947 F.2d 398, 404 (9th Cir. 1991).  Neither the Florida case nor the Ninth Circuit decision considers Illinois law.  The former applied the Florida doctrine that an owner's equitable right of redemption is limited to agreements "made contemporaneously with or as part of" a mortgage transaction. Illinois, in marked contrast, expressly invalidates by statute a power of sale contained in a mortgage "or any other agreement," 735 ILCS 5/15-1405, and Illinois courts "take a dim view of any attempt to limit or extinguish the mortgagor's equitable right of redemption." *Hans*, 493 N.E.2d at 1174. Indeed, these cases, both of which involved commercial real estate transactions between sophisticated parties,  emphasize the unique circumstances presented.  595 So.2d at 182; 947 F.2d at 402.  As the Florida appellate court itself cautioned: "our decision should not be interpreted as a general approval for the use of such documents in resolving other foreclosure proceedings. Such arrangements should be carefully scrutinized to assure that they do not violate the favored right of redemption."  595 So.2d at 183.

absolute in lieu of foreclosure.  R.R. Powell & P.J. Rohan, Powell on Real Property §

37.44 (2014).

Alpine does not identify authority to suggest that Section 15-1401 was intended to

permit and make enforceable 'contingent' deeds in lieu of foreclosure or that the statute

was otherwise intended to modify the doctrine of equitable mortgage.  To the contrary,

Illinois courts have repeatedly concluded that the Illinois Mortgage Foreclosure Law

enacted in 1987 "was intended by its drafters to integrate into one statute as much of the

law of mortgage foreclosure as possible" and to "codif[y] the prior statutory law and case

law on the subject." *Olney Trust Bank v. Pitts*, 558 N.E.2d 398, 402 (Ill. App.1990)

(internal citation omitted).  While the 1987 amendment to the statute for the first time

explicitly references deeds in lieu of foreclosure, id., the use of such instruments have

long been treated by Illinois common law. *See, e.g., Richardson v. Hockenhull*, 85 Ill.

124 (Ill. 1877).  Generally, the "premise behind deeds in lieu of foreclosure [was] to

allow a borrower to transfer title to the lender in exchange for a release of his or her

obligations under the note and mortgage" and the "IMFL does not alter that which had

been implicit in prior practice." *Olney*, 558 N.E.2d at 402.  Neither the terms of the 1987

amendments nor their subsequent construction by the courts suggest that the practice or

applicable doctrine has been altered.  If Section 15-1401 makes any change from prior

practice, it is to make "it absolutely clear that a deed in lieu of foreclosure releases all

mortgagors from personal liability" except as otherwise provided in the statute.  *Id*.

Alpine offers no authority to suggest that the 1987 amendments to the statute were

intended to vitiate the doctrine of equitable mortgages as long articulated by Illinois

courts or the common law equitable doctrines prohibiting contractual limitations on a

mortgagor's equitable right of redemption.

4.     **The Debtor Here May Assert Her Equitable Right of Redemption.**

Applying the principles discussed above to the facts in this case, it is clear that the execution, delivery and recording of the Debtor's quit claim deed was ineffective to transfer title in her Rockford, Illinois property from Ms. Primes to Alpine Bank. Instead, the Debtor still owned the Mila Ave. property as of the petition date. Alpine Bank holds only a secured claim which could be modified through a plan pursuant to and in accordance with Chapter 13 of the Bankruptcy Code.

The evidence establishes that the parties did not intend for the quit claim deed to immediately transfer title to the Mila Ave. property from the Debtor to Alpine Bank on July 13, 2011. The Forbearance Agreement provided that the deed would be held in escrow and not recorded until after a future default in the Debtor's payment obligations. Additionally, at least for some period after July 13, 2011, the Debtor continued to make and Alpine Bank continued to accept payments. Alpine instead simply held the deed for the contingency of a later default. The bank's officer admitted at trial that it was not his bank's understanding that it was receiving the property at the time the Debtor deliver the deed; rather the instrument was security to secure the loan. Therefore, the deed here is not a deed in lieu of foreclosure as contemplated by 735 ILCS 5/15-1401.

Further, it is clear from the language of the Forbearance Agreement and the bank's actions that Alpine Bank did not intend that the recording of the quit claim deed would extinguish or satisfy the debt owed by the Debtor to the bank. The Agreement expressly states that the "recording of the Deed will not extinguish the debt of Borrower to Bank." The Agreement also provides that the debt would not be reduced until the

further step of a sale of the property to a third party. The Agreement states that "[u]pon the sale of the Property, Bank shall provide a credit to Borrower against the indebtedness which is due at that time" and that any "deficiency which remains after the sale of the Property shall be due and payable in full to Bank from Borrower." Again, as the bank's officer admitted, the quit claim deed was security for its loan that it only recorded after the Debtor missed several payment installments.

Alpine cannot have it both ways. As stated in *Sutphen v. Cushman*, the bank cannot argue that it holds the property absolutely and at the same time retain the right to enforce payment of the full debt. 35 Ill. 186 (Ill. 1864). At most, the parties intended to agree upon a mechanism that they believed would allow Alpine Bank to obtain title to the property upon a future default without the need for judicial foreclosure and without requiring future cooperation of the Debtor. But as stated by the Illinois Supreme Court in *Bearss*, parties cannot "by mere agreement ... even by express stipulation" agree in advance to "cut off the right of redemption" in such a manner. 108 Ill.16.

Even were this court able – which it is not - to set aside *Bearss* and the well-established law of Illinois and, as Alpine now proposes, adopt the approach taken by the courts in *Ringling Joint Venture II and Guam Hakubotan, Inc.*, it does not appear that result here would change. In marked contrast with those decisions, the instant case involves an individual debtor's residential property in a consumer transaction with an unsophisticated borrower. There is no evidence that the Forbearance Agreement was drafted at the insistence of the Debtor or that she signed it in bad faith. Indeed the Debtor testified without dispute that she intended to make payments under the agreement at the time she signed it, that she did initially make payments and only fell behind after she

broke her wrist and was out of work for several months.

Accordingly, the Debtor held title to the property as of the date of the petition.

## B. Feasibility of the Proposed Plan.

In its initial motion for stay relief, the only argument raised by Alpine was that the stay should be lifted as to the Mila Ave. property pursuant to Section 362(d)(2) of the Bankruptcy Code because the Debtor no longer had an interest in the real estate and could not "reinstate" the original mortgage through a bankruptcy plan or through Illinois law. (Mot., ¶ 12, and Accompanying Statement, ECF No. 21 ).[7]   Alpine Bank has not presented any proof as to lack of equity, arguing only that  title passed prepetition.  In Alpine's reply brief, however, the bank briefly raises in passing a second argument: that even if the bank's interest is treated as a secured claim, the loan is scheduled to mature during the course of the Chapter 13 proceeding and the Debtor "cannot, and has not, proposed a feasible plan that pays Alpine's obligation in full." (Alpine Reply, ECF. No. 34).

The appropriate level of scrutiny for a plan in connection with a motion for relief from stay is not necessarily the same as the standard for confirmation of the plan. *Edgewater Walk Apartmemts v. MONY Life Ins. Co.,* 162 B.R. 490, 498 (N.D. Ill 1993). Adjudicating a relief from stay motion, therefore, must not be a mini confirmation

---

[7] The statement accompanying the motion also " checks off" additional grounds for relief under Section 362(d)(1), alleging "other cause," namely,  that "the Debtor has filed this petition in bad faith in an attempt to circumvent a duly executed Forbearance Agreement and Quit Claim Deed she signed pre-petition." (Accompanying Stmt., ECF No 21. ). Beyond this clerical notation, Alpine Bank has not pursued this argument and it will be deemed to be abandoned.  Further, any supposed claim that the Debtor has in bad faith "circumvent[ed]" the effect of the provisions discussed above is moot in light of the determination that Illinois law treats the agreement and deed as mere mortgages  and that her tender of the Quit Claim Deed by itself did not deprive the Debtor of her equitable right of redemption and, therefore, a protectable interest in the Rockford property.  Alpine presumably does not choose to argue that efforts to circumvent provisions that are void under state law constitute "bad faith" for purposes of filing a bankruptcy petition. See *In re Wells*, 227 B.R. 553 (Bankr. M.D. Fla. 1998) (bad faith will not be implied solely because the debtor is attempting to exercise its enforceable rights).

hearing. See, e.g., *In re Windwood Heights, Inc.*, 385 B.R. 832 (Bankr. N.D. W.Va. 2008); *In re Cadwell's Corners Partnership*, 174 B.R. 744, 759 (Bankr. N.D. Ill. 1994) ("Even at the later stages, a motion for relief from stay should not be turned into a confirmation hearing.") (citing *In re Ashgrove Apartments of DeKalb County, Ltd.,* 121 B.R. 752, 756 (Bankr. S.D.Ohio 1990)).

At the outset it must be noted that because title to the Rockford property did not pass, the plan provisions providing for payment of the debt as a secured claim do not render the plan unconfirmable. Further, the Debtor's schedules disclose that there was some equity in the property at the time of the filing. No other valuations were submitted nor was the accuracy of these valuations questioned by Alpine Bank at the hearing. The balloon payment is due in July 2016. Currently, there appears to be some equity in the property and the plan calls for monthly principal and interest payments to Alpine Bank of $500.08 per month. The Debtor testified that she has employment as a caregiver and earns a regular income and her Schedule I reported her net average monthly income to be $3,276.62.

It was not controverted at trial that the Debtor has been making her monthly mortgage payment and has also been making plan payments to cure her $4,750 arrearage to the bank, and there has been no post-trial allegation that this does not continue to be the case. The Debtor testified that she will attempt to refinance the loan before the maturity date, and can receive help from her family for this, if that is necessary. The bank did not challenge this testimony on cross examination nor presented any evidence to rebut that testimony. Indeed, the Debtor was able to successfully restructure her loan terms in the past and Alpine offered no evidence to rebut her testimony that she will be

able to do so when the balloon payment becomes due.

There is no *per se* bar on a provision to fund certain plan payments through sale or refinance. See, e.g., *In re Bateman*, 515 F.3d 272, 279 (4th Cir. 2008) ("Indeed, as the Chapter 13 Trustee concedes, 'many [Chapter 13] plans are predicated on a refinancing or sale of estate property in less than three years.'"). While Ms. Primes' testimony as to the potential for refinancing may not be incontrovertible, Alpine Bank did not rebut it. Thus, at the lower level of scrutiny to be applied here, the Debtor has shown it to be plausible that she may be able to refinance her loan and that her plan has the requisite potential for successful reorganization.

Accordingly, in light of the standards and requirements for stay relief, at this stage of this case Alpine's feasibility argument also must be rejected.

## CONCLUSION

For the foregoing reasons, the motion for relief from stay will be denied. A separate order shall be entered giving effect to the determinations reached herein.

DATE: September 26, 2014          ENTER:

_____
Thomas M. Lynch
United States Bankruptcy Judge